THE ATTORNEY GENERAL v. THE BOARD OF COUNTY CANVASSERS OF IRON COUNTY.

*Constitutional law—Organization of county—Establishment of county-seat—Election—Duty of board of canvassers—Jurisdiction of Sup eme Court to regulate action of municipal officers.*

Section four of Act No. 35, Laws of 1885, providing for the organization of Iron county, provided for the canvass of the votes author-

ized to be cast on the question of the permanent location of the county-seat, by a board of canvassers, consisting of persons to be appointed by the several boards of township inspectors on election day, which board were required to meet on a given day, and organize in the manner prescribed by said section, and proceed to canvass the votes cast for the purpose aforesaid; and the secretary of said board was required to file a certificate of the number of votes cast for each location voted for, and of the place designated and selected by said votes, signed and certified by him as secretary, and countersigned by the chairman of the board, with the Secretary of State. It was further provided, by section eight of the act, that the several boards of inspectors should conduct the election, and make return thereof, in accordance with the general provision of law for conducting general elections, so far as the same may be applicable thereto.

The board met and organized, and adjourned without canvassing the votes; and, in their answer to an order to show cause why they should not be compelled by *mandamus* to proceed with such canvass, they set up various reasons resting on alleged frauds and irregularities in the election at different precincts, and also—

*a*—That, having met and adjourned *sine die*, they have gone out of office, and have no further functions.

*b*—That no legal votes were cast, owing to the alleged invalidity of the statute.

*c*—That no legal ballots were cast for the place which received the majority of all of the votes cast at the election, which were for "Crystal Falls," there being a township by that name of large dimensions, and no definite place named within it.

*d*—That no notice was given of the general election.

*e*—That separate boxes were provided for county-seat ballots.

*f*—That the proceeding to establish a county-seat is a political one, not involving judicial questions, and this Court has no jurisdiction in the premises.

In passing upon the questions involved, the Court held:

1. Said board of canvassers were created for a specific purpose, were not a judicial or *quasi* judicial body, nor a permanent one with administrative functions. No means are given, nor had the board any right, to inquire beyond the returns of the local election boards; and when these were figured up exactly as handed over to the board, the canvassers had completed their task and exhausted their powers, and until they had done this they had no right to dissolve their meeting.

2. The lawfulness of a separate ballot-box is not doubted, and is provided for on votes to remove county-seats. How. Stat. § 491.

3. The law does not require a county-seat to be on a particular village or city lot or square; and it cannot be presumed that, as be-

tween a *large* territory and a *fixed* settlement, the location was meant to be *at large* and not *definite.*

4. The act required this election to be at the next general State election, and such direction cannot be made nugatory by any failure to give notice of the same. *People v. Hartwell,* 12 Mich. 508; *People v. Witherell,* 14 Id. 48.

5. It is within the province of courts to restrain public bodies, and officers of counties and other municipal divisions from *exceeding* their jurisdiction, and also to require them to perform such *specific* duties as the law imposes on them.

6. The Legislature may make such provisions as they see fit for the *original* establishment of the county-seat of a county. *Rice v. Shay,* 43 Mich. 380.

7. Act No. 35, Laws of 1885, providing for the organization of Iron county, established the county-seat *temporarily* at Iron River, leaving it for the people to make a *permanent* establishment in the manner pointed out in the act, which was not in violation of section 8 of article 10 of the Constitution. *Attorney General v. Weimer,* 59 Mich. 580.

Mandamus to compel respondents to meet and canvass the votes cast for the establishment of the county-seat of Iron county. Argued January 18, 1887. Granted January 27, 1887. The facts are stated in the opinion and head-notes.

*Cyrus T. Crandall,* for relator.

*W. P. Healy,* for respondents.

CAMPBELL, C. J.    By Act No. 35 of the Laws of 1885 (Laws 1885, p. 32), under which the county of Iron was organized, it was provided that the temporary county-seat should be at Iron River until the permanent county-seat should be fixed as in said act provided. The act further required that the permanent county-seat should be determined by vote at the next general State election, which would occur in 1886, when the qualified voters were to cast their ballots for such place as they should designate, and the place receiving the highest number of votes should be the permanent county-seat. These votes were to be canvassed

by a board, consisting of persons appointed on the day of election by the several boards of township inspectors, who were to meet at Iron River on the second Tuesday succeeding the election, and canvass them. It was made the duty of the secretary of said board to "file a certificate of the number of votes cast for each location voted for, for said county-seat, and a certificate of the place designated and selected by said votes, signed and certified by himself as secretary, and countersigned by the chairman, with the Secretary of State, and with the township clerks of the several townships of said county."

This board met and organized, and adjourned without canvassing the votes. A *mandamus* is now asked to compel them to meet and make the canvass.

The return does not deny that they met and adjourned without day; and claims that, having done so, they have gone out of office, and have no further functions.

They further claim that no legal votes were cast; the only intelligible ground for this claim being the alleged invalidity of the statute. They also claim that no legal ballots were cast for the place which received the majority of all the votes cast at the election, which were for "Crystal Falls," because there is such a township of large dimensions, and no definite place named within it. They also claim that no notice was given of the general election, and that separate boxes were provided for county-seat ballots; and they undertake to set up various other reasons, resting on alleged frauds and irregularities in the election at different precincts.

Before considering the statute as regards its legal validity, it is proper to refer to the various methods attempted by respondents to avoid the performance of their legal duties. This statute defines who shall be canvassers, and respondents are the canvassers provided for. It requires them to organize with chairman and secretary, which they also have done. It then imposes upon them the single and specific duty of

canvassing the votes certified by the election officers, and certifying the number of votes cast for each location, and the place designated. They are not a judicial or *quasi* judicial body. They are not a permanent body with administrative functions. They are created for a single occasion and for a single object. They have no means given them to inquire, and no right to inquire, beyond the returns of the local election boards. They have no right to raise outside issues to decide themselves, or to ask us to decide. When they have figured up the returns exactly as handed over to them, they have completed their task and exhausted their powers. Until they have done so, they have no right to dissolve their meeting. They can only get out of their office by completing its work. It would be worse than absurd to allow a board of canvassers to defeat the popular will, and destroy an election, by refusing or neglecting to do what the law requires them to do. They may bring themselves within the punishment of the law by such misconduct, but they cannot destroy the vote.

We do not very well see what they have to do with inquiring whether the ballot-boxes were separate or single, nor is it their function to inquire into the geographical character of the vote. But we have no doubt that a separate ballot-box was lawful, and more convenient than any other. This is expressly provided for on votes to remove county-seats. How. Stat. § 491. Neither is there any difficulty in holding that the vote for "Crystal Falls" means the settlement of that name. The law does not require the county-seat to be on a particular village or city lot or square, although there have been some instances of that kind; and it cannot be presumed that, as between a large territory and a fixed settlement, the location was meant to be at large and not definite.

The statute makes the time and occasion of this election imperative. It is required to be at the next general State election. Where such a direction is given, it cannot be made

nugatory by any failure to give notice. Every one is bound to take notice of what the statute requires. *People v. Hartwell,* 12 Mich. 508; *People v. Witherell,* 14 Id. 48.

An objection is also made to the jurisdiction of this Court because it is claimed that the proceeding to fix the county-seat is a political one, and does not involve judicial questions. The cases referred to by counsel are those where certain non-judicial bodies are given the determination and management of various public affairs, and given powers of final judgment. Such is the case where proceedings have been regularly carried to an election under the statutes relating to the removal of county-seats. *Attorney General v. Supervisors of Lake Co.,* 33 Mich. 289; *Attorney General v. Supervisors of Benzie Co.,* 34 Id. 211; *Hipp v. Supervisors of Charlevoix Co.,* 62 Id. 456.

But it is within the province of courts to restrain public bodies, and officers of counties and other municipal divisions, from exceeding their jurisdiction, and also to require them to perform such specific duties as the law imposes on them. The power to review action which is not judicial is in no way similar to the power to keep respondents within the line of their duty. This jurisdiction is constantly exercised, and the doctrine too elementary to discuss. Every term of court presents instances of such interference.

The only really pertinent question presented is whether the law itself is valid. The clause of the Constitution supposed to stand in the way is section 8 of article 10, which declares that—

" No county-seat, once established, shall be removed until the place to which it is proposed to be removed shall be designated by two-thirds of the board of supervisors of the county, and a majority of the electors voting thereon shall have voted in favor of the proposed location in such manner as shall be prescribed by law."

It is not seriously contended, and could not be under our Constitution, that the Legislature may not make such pro-

vision as they see fit for the original establishment of the county-seat of any county. *Rice v. Shay*, 43 Mich. 380. But it is claimed that the statute of 1885 established the county-seat of this county at Iron River, and so exhausted its power.

It is very clear that this was not the purpose of the act. It is impossible to get county business started efficiently without some place where it is temporarily centralized. Sometimes this is done by requiring courts and other bodies to meet at some place named or appointed until a county-seat is established, and sometimes by naming some place directly as a temporary county-seat for all purposes. Such a temporary selection is in no sense an establishment. That means a selection intended to be permanent. Undoubtedly it might be possible, under the pretext of a temporary selection, to attempt to do something more. But that is not to be anticipated. If the Legislature, instead of fixing the place themselves, or appointing commissioners to do so, as we held was lawful in *Rice v. Shay, supra*, preferred, as they did here, to let the people themselves indicate their preference, it could only be done effectively at some election at which the people would be likely to vote, and until such election there must be some place for doing county business. When this act was attacked on a precisely similar constitutional ground on the appointment of county officers for Iron county, we held in *Attorney General v. Weimer*, 59 Mich. 580, that the constitutional right of the people to choose their own officers was not infringed by the provisional appointment of persons to act as county officers until a regular election should be held at the next general election, which was the same election at which the county-seat was voted on. The principles then laid down were precisely analagous to those that govern this case. Provisional action for the purpose of setting county affairs in motion cannot be dealt with as permanent action. We think there is no

room for doubting the purpose of the Legislature in making the location at Iron River temporary and provisional.

The bitterness and persistency with which the establishment of this county has been obstructed have been very noticeable, and have gone beyond reason. It is the duty of the persons intrusted with public functions to obey the statute. In the present case there has been a plain disregard of legal provisions, which, if the respondents obeyed far enough to hold and organize their meeting, should have been followed out to a conclusion. The rights of the people cannot be allowed to be thus violated. The *mandamus* will be allowed as prayed, requiring prompt action.

The other Justices concurred.